# Central Trust Co. of Owensboro, Ky., et al. v. McCarroll, et al.

(Decided December 15, 1910.)

## Appeal from Daviess Circuit Court.

1. Guardian and Ward—Selection of Guardian by Infant—Common Law Rule.—No good reason can be given for allowing one boy to select his own guardian because the occasion arises after he is 14 years old, and denying to another the same right because some county judge has selected a guardian before he reached fourteen. The object of the common law rule was to give the minor a chance to have a guardian who would be at least personally agreeable to him and therefore when he reached the age of discretion he was permitted to supersede any former guardian and nominate one of his own choosing. The same reason exists now as did then; and while the language of the statute is not as clear as it might have been made yet we think its reason and spirit require that it should be construed as not changing the common law rule except to this extent; after the infant has had one choice he cannot supersede a guardian of his nomination by another unless the guardian be removed for causes set out in the statute.

2. Statutory Provisions—Approval of County Judge—Statutes authorizing the minor to choose his own guardian after arriving at the age of 14 do not commit this important matter to his unrestrained choice, but the county judge has a supervisory direction over his choice, and unless the guardian selected by the infant meets the approval of the county judge he may require the minor to make another, and so on, until the selection meets the approval of the judge.

LITTLE & SLACK, for appellants.

C. S. WALKER for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE BARKER—Affirming.

The question arising for adjudication on this record is whether under our statute regulating the matter, a ward may, after arriving at the age of fourteen years, supersede a former guardian appointed for him and nominate one of his own choosing. At common law the rule was that when an infant arrived at the age of fourteen years he had reached what was called the age of discretion, and from that time on until he reached his majority, he could among other things, select his own guardian. Blackstone in his Commentaries, volume 1,

page 463, says on this subject: "A male at twelve years old may take the oath of allegiance; at fourteen is at years of discretion, and, therefore, may consent or disagree to marriage, may choose his guardian, and, if his discretion be actually proved, may make his testament of his personal estate. * * *" This common law rule prevails in this state, except where repealed or modified by the statute.

In the case of Montgomery v. Smith, 3 Dana, 599, this court speaking through Chief Justice Robertson, said:

"As the court of the county of an orphan's actual domicile may have power to appoint a guardian, and as a ward may, on attaining fourteen years of age, supersede his appointed guardian, by choosing another person for guardian—we perceive no objection to the power of the county court of Russell, if, as we infer, Robert Montgomery was domiciled in that county, and if also, he was fourteen years of age when he chose Smith for guardian; for the ward had a perfect legal right, by election, to terminate the authority of Francis Montgomery."

The appellant, while admitting the common law rule as expounded in the foregoing opinion, insists that our present statute regulating the subject in hand changes the common law rule. Section 2022, Ky. Stats., is as follows:

"If a minor is fourteen years of age, he may, in the presence of the court, or by writing signed in the presence of the judge, after privy examination, nominate his own guardian; but if the person so nominated is not approved by the court, or if the minor, after summons, fails to nominate a suitable person, or resides out of the state, or if the testamentary guardian fails for three months to qualify, the court may appoint a guardian of its own selection."

It is urged that the foregoing language of the statute limits the power of the minor to select or nominate his own guardian if he be fourteen years old at the time of the first appointment, and that if before he is fourteen the court has selected for him a guardian, that guardian may not be superseded by the infant after he arrives at fourteen, but can only be removed for cause as set forth in sections 2024, 2025 and 2026, Ky. Stats. We cannot give our consent to this construction of the statute. The rule of the common law was a wise one. After the minor reaches the age of fourteen, or, as it

was called, the age of discretion, the personal equation of the guardian and ward becomes of importance Upon reaching the age of discretion it is a very important matter to a ward to have a guardian who, at least, will be personally pleasant and sympathetic with him. After fourteen the youth commences to shape his education to fit him for the stern realities of life, and he has views of his own as to the kind and quality of the education he desires to acquire, and the future business or occupation he wishes to pursue. It does not require much imagination to see how disastrous it might be to a boy's life if he possessed a guardian who desired to force him to fit himself for a business for which he had no inclination or talent. Let us assume that the youth desired to enter the ministry, while his guardian insisted that he should be a lawyer. The young man's whole life might be wrecked by the perverse want of sympathy on the part of the guardian for his views and desires. The great author of "The Confessions of an English Opium Eater" had his whole life wrecked and shattered by the want of sympathy on the part of a cold and rigorous guardian for the views of a youthful genius on the subject of his education.

No good reason can be given for allowing one boy to select his own guardian because the occasion arises after he is fourteen, and denying to another the same right because some county judge has selected a guardian for him before he reached fourteen. The object of the common law rule was to give the minor a chance to have a guardian who would be, at least, personally agreeable to him, and, therefore, when he reached the age of discretion he was permitted to supersede any former guardian and nominate one of his own choosing. The same reason exists now as did then; and while the language of the statute is not as clear as it might have been made, yet we think its reason and spirit require that it should be construed as not changing the common law rule, except to this extent: After the infant has had one choice, he cannot supersede a guardian of his own nomination by another, unless the guardian be removed for the causes set out in the statute.

It will be observed that the statute authorizing the minor to choose his own guardian after arriving at fourteen, does not commit this important matter to his unrestrained choice, but the county judge has a supervisory direction over his choice, and unless the guardian

selected by the infant meets the approbation of the county judge, he may require the minor to make another choice, and so on until the selection of the minor meets the approval of the judge. This, we think, is a wise and beneficent statute, giving the infant the fullest latitude consistent with his welfare, and effectually preventing his being misled by the wiles of artful and designing persons who might seek to ingratiate themselves into his inexperienced affections for selfish and sinister purposes.

For these reasons we are constrained to affirm the judgment of the lower court permitting the ward to supersede a former guardian appointed for him prior to the time he had arrived at the age of fourteen years by nominating a guardian of his own choosing; and it is so ordered.

## Lucas v. Commonwealth.

(Decided December 14, 1910.)

### Appeal from Bourbon Circuit Court.

Homicide— Evidence — Competency— Proof of Character — General Reputation.—On the trial of L. for manslaughter by killing S., the court did not err in refusing to permit a witness to testify that he had a conversation with S. wherein S. said to the witness that he intended to quit work: that he was a "short change" artist and could make a living easier than by working. The rule is that the inquiry must relate to the violent and dangerous character of the deceased. Proof of such character can only be made by his general reputation in the community for such character, and not by evidence of specific acts or general bad conduct, or by isolated facts which are not connected with the homicide.

EMMETT M. DICKSON and J. J. WILLIAMS for appellant.

JAMES BREATHITT, Attorney General, and TOM B. McGREGOR, Asst. Attorney General, for appellee.

OPINION OF THE COURT BY WM. ROGERS CLAY, COMMISSIONER—Reversing.

Appellant, W. H. Lucas, was convicted of manslaughter and his punishment fixed at confinement in the penitentiary for a period of three years. From the judgment of conviction he appeals.

The facts, briefly stated, are as follows: Appellant was a former resident of Harrison and Bourbon counties, Kentucky. For several years prior to the killing he resided in the State of Indiana. In February, 1909, he returned to Kentucky and was engaged in farm labor nearly all the time between his arrival in Kentucky and the time of the difficulty which resulted in the killing. On the night of September 25, 1909, he, in company with his friend and kinsman, William Dailey, boarded a train leaving Cynthiana at about 10:30 o'clock and reached Paris shortly before 11:00 o'clock. Upon their arrival in Paris they went to a boarding house kept by one James Curtis in the vicinity of the depot. Curtis was a friend of Dailey's. There they ate supper and remained for a few minutes. They then went to a saloon kept by a man by the name of Lyons, where one Phillips, who was likewise a friend of Dailey's, was employed. At this saloon they met a man by the name of Bud Harney. Harney was formerly a resident of Harrison county, and was an acquaintance of Dailey's. He was not present when the difficulty took place. After remaining at this saloon for a few minutes, Harney proposed that they go across the street. He then conducted them to a saloon kept by a man by the name of Mike Woods. There Harney proposed a drink, and they each took a glass of beer. Dailey then purchased the second glass of beer for each of them. Appellant Lucas drank only a portion of this second glass and poured out the rest. While there, Dailey, the companion of Lucas, also purchased a bottle of whisky, for which he paid a dollar. About this time appellant asked Harney where he was going to stay all night. Harney replied that he did not know. Appellant said that he (Lucas) had a notion of staying all night with him (Harney). Harney said, "I will furnish a place to stay if you want to play seven-up." Appellant replied that he had no money with which to play seven-up; whereupon Harney said, "I will stake you." Appellant replied, "No, I don't want to gamble." At this juncture Dailey said he had the money, but did not want to gamble; and thereupon exhibited a roll of one and two dollar bills. Taking one of the dollar bills he paid for the bottle of whisky and placed the remainder in his pocket. Clarence Prebble was the barkeeper at this saloon. The aforesaid conversation took place in his presence. Stone, another prosecuting witness, was in a rear room and could have seen

and heard what was going on. Whether he did or not does not appear. After Dailey made the remark about having the money, he and appellant left the saloon and, at the direction of Harney, proceeded to the Fordham Hotel for the purpose of securing lodging for the night. There they were informed the hotel was full and that they could not be accommodated. It was then about 12 o'clock. Appellant and Dailey left the hotel and returned to Lyon's saloon, where Dailey's friend, Phillips, was employed. When they reached there they found the saloon had closed and Phillips gone. They then went back to Woods' saloon. Woods was just coming out and announced that his saloon was closed.

From this point on the evidence is very conflicting. According to the testimony for the Commonwealth, Prebble, Woods' barkeeper, closed the saloon preparatory to taking a walk, which was his usual custom. He was joined by three men, one by the name of Fronk, one by the name of Stone, and one by the name of Sagaser, who was afterwards killed. Near the corner of Ninth and Main streets they came upon Dailey and appellant. Either appellant or Dailey asked them where they could secure accommodation for the night. They were informed that there were a number of hotels and boarding houses in the city; that there was a boarding house a short distance from where they stood. Appellant replied that they did not want to go to a hotel or boarding house, but would like to find a livery stable or some other place and await the departure of the early morning train for Cynthiana. One of the parties accompanying Sagaser informed them of a certain livery stable where he had a friend employed and who, he claimed, would be glad to accommodate them. The whole party proceeded in the direction of this livery stable until they arrived at the corner of Seventh and Pleasant streets near the Methodist church. There Sagaser, the deceased, and one of the prosecuting witnesses was about to leave the crowd. Appellant was informed by this witness that another member of the party would show them where the stable was. Just as the party was about to separate, Dailey said something about taking a drink of whisky. Sagaser, the man who was killed, replied that he would not object to taking a drink. Dailey offered them a drink of whisky out of the bottle he had previously purchased at Mike Woods' saloon. Appellant, who was some distance in advance of the crowd, spoke

up and told Dailey not to let any of those parties (using a vile epithet) have any of the whisky. Sagaser became offended at this remark, and told appellant not to be so God damned rough about it. At this juncture, according to one of the witnesses for the Commonwealth, Dailey raised his hand and was in the attitude of striking Sagaser. From the evidence of the other two witnesses for the Commonwealth, who were present, it would seem that Sagaser began to advance towards appellant. It was then that appellant pulled his pistol and fired three shots, one of them taking effect and producing a mortal wound.

Upon leaving Woods' saloon, the testimony of appellant and Dailey is to the effect that they found three or four persons standing in front of the saloon, all of whom were strangers to appellant and Dailey but one, whose name was William Stone, and who was one of the prosecuting witnesses in this case. Appellant asked Stone to direct him to the Louisville & Nashville depot. Stone did direct him. Just at this time, Dailey, who had walked on, called to appellant and said that he (Dailey) knew the way. Thereupon appellant joined Dailey. They walked north on Main street about a half a block where Seventh street crosses Main street. They then turned to the right and went east on Seventh street until they reached Pleasant street. Upon the northwest corner of these two streets stands the Methodist church. Here it was the difficulty occurred. Just before reaching this point appellant and Dailey were joined by four men who afterwards proved to be Prebble, Stone, Fronk and Sagaser, the man who was killed. One of the four men asked appellant and Dailey where they were going to stay all night. Dailey told them he was going to old man Curtis'; that Curtis kept an all night house and that he (Dailey) was going to stay there in order to get off on the early morning train to Cynthiana. Dailey fell back of these men and appellant walked about 15 feet in advance of them. About the time they reached the corner of Pleasant and Seventh street, appellant looked back and saw one of the men, who proved to be Sagaser in the act of striking Dailey with something in his hand. Whereupon appellant said, "Oh hell, boys, don't do that." Thereupon Sagaser turned from Dailey and advanced upon appellant, striking at him twice. As he did this, appellant drew his pistol and fired three times in rapid succession. Immediately after shooting, ap-

pellant asked Dailey what that fellow hit him for. Dailey replied, "Those fellows meant to rob us." About an hour after the difficulty a slung shot was found on the church steps. It was shown that this slung shot had been given to Sagaser about two days prior to the killing. Several witnesses testified that Sagaser's reputation for peace and quiet and good order was bad, while that of appellant was good. In rebuttal two or three witnesses, who saw appellant and Dailey after the killing testified that appellant said he was drunk and had no recollection of having killed anybody. They also said they did not see any bruise on Dailey's face, though they did not examine him for that purpose.

Instructions one and two, given by the court, are in the usual form and are not complained of. Instruction three is as follows:

"The court instructs the jury that if they believe from all the evidence that the defendant, Lucas, believed and had reasonable grounds for believing, that at the time he shot and killed William Sagaser, if he did shoot and kill him, that he was then and there in danger of loss of life or great bodily harm at the hands of said Sagaser, or if they shall believe from the evidence that at the time said Lucas shot and killed said Sagaser, if he did shoot and kill him, that he believed and had reasonable grounds for believing that his kinsman and companion, Dailey, was then and there in danger of loss of life or great bodily harm at the hands of said Sagaser, or if they shall believe that at the time of said shooting and killing, it reasonably appeared to the defendant to be necessary to shoot and kill said Sagaser to avert the then impending danger, or apparent danger, or loss of life, or great bodily harm, then he had the right to so shoot and kill said Sagaser, and the jury should acquit him on the ground of self-defense."

Counsel for appellant asked the court to give the following instruction:

"A-3. The court instructs the jury that although they may believe from the evidence that Lucas shot and killed William Sagaser, as charged in the indictment, yet, if they further believe that at the time he did so shoot and kill Sagaser, said defendant believed and had reasonable grounds for believing that he or his kinsman and companion, Dailey, was then and there in danger of loss of life or of great bodily harm at the hands of said Sagaser, or of his companions, William Stone, Clarence

Prebble, Pearce Fronk, or any or all of them acting in concert or conspiracy with said Sagaser, or if they shall believe that at the time of said shooting, it reasonably appeared to the defendant to be necessary to shoot and kill said Sagaser to avert the then impending or apparent danger of loss of life or great bodily harm, either to himself or to said Dailey, at the hands of said Sagaser and his companions, or any of them acting in concert or conspiracy with him, then he had the right to so shoot and kill Sagaser, and the jury ought to acquit him on the ground of self-defense.''

This instruction the court declined to give, and the error of the court in this respect is relied upon as the chief ground for reversal.

When we take into consideration the fact that the record shows that Prebble, Stone, Fronk and Sagaser were companions; that Prebble was Woods' barkeeper, and the other three were habitues of the saloon where he was employed; that according to Prebble's own testimony, all four left the saloon at 12:30 a. m., without saying anything about going home, and merely for the purpose of taking a walk, and that ''all had to come back;'' that at least one of the four knew that Dailey and appellant had been drinking, and that Dailey had on his person a roll of money; that the evidence for appellant tends to show that these four parties followed appellant and Dailey up the street; that no difficulty or altercation occurred while they were on Main street of the city; that Sagaser had upon his person a slung shot, a dangerous weapon well adapted for the purpose he had in view in case the testimony for appellee is to be believed; that upon reaching a dark and secluded spot, Sagaser, without any angry words having been previously used, suddenly struck Dailey in the head with the slung shot, we conclude that there was sufficient evidence of the fact that all four parties were acting in concert to authorize the giving of the instruction asked for by appellant. It is not for us to express an opinion upon the facts of this case, one way or the other. It may be that Sagaser acted entirely independent of the others, and that they had no unlawful purpose at the time. On the other hand, it may be that they were acting in concert and were there for the purpose of aiding, abetting and assisting Sagaser; whether the one or the other, it is for the jury to say. Upon the next trial the court will give the instruction asked for.

The court did not err in refusing to permit the witness, Steagall, to testify to a conversation which he had with Sagaser, in September, 1909, wherein Sagaser said to the witness that he intended to quit work; that he was a "short-change" artist and could make his living easier than by working. The rule is that the inquiry must relate only to the violent and dangerous character of the deceased. Proof of such character can only be made by evidence of his general reputation in the community for such character, and not by evidence of specific acts or general bad conduct, or of isolated facts which are not connected with the homicide. (Trabune v. Commonwealth, 13 Ky. Law Rep., 343; Ferrell v. Commonwealth, 15 Ky. Law Rep., 321.) The same rule would exclude conversations had with the deceased.

Other alleged errors are complained of, but, as the matters to which they relate are not such as will likely occur on another trial, we deem it unnecessary to consider them.

Judgment reversed and cause remanded for a new trial consistent with this opinion.

Whole court sitting.

JUDGES CARROLL, SETTLE and LASSING dissenting.

DISSENTING OPINION BY JUDGE CARROLL:

As I do not concur in the opinion of the majority of the court in this case, I think it proper to state the reasons for my dissent.

The only ground upon which the judgment of conviction is reversed is because the trial court refused to give instruction A-3 copied in the opinion, stating in substance that if Lucas believed, or had reasonable grounds to believe, that either he or Dailey was in danger from harm at the hands of the deceased Sagaser, or his companions Stone, Prebble and Fronk, or any of them, acting in concert with Sagaser, and it reasonably appeared to Lucas to be necessary to shoot and kill Sagaser to avert the danger to himself or Dailey at the hands of Sagaser and his companions Stone, Prebble or Fronk, or either of them, then he had the right to kill Sagaser in self-defense. It will thus be seen that the only matter I need discuss is, whether or not there is any evidence or fair inference therefrom in the record that would have justified the trial court in giving this instruction. To put the question squarely so that there may be no misunderstanding about my position, I agree

that if there is in the record any evidence that Lucas or Dailey were at the time or before Sagaser was killed in any danger from Stone, Prebble or Fronk, or either of them, or, if there is any fact or circumstance in the record from which it can be reasonably or fairly inferred that Lucas at the time or before he killed Sagaser believed or had reasonable grounds to believe that either he or Dailey was in danger at the hands of either of them, or, if there is any evidence in the record even tending to show that Stone, Prebble or Fronk, or either of them, were acting in concert or agreement with Sagaser, or in any way aiding or abetting him when he assaulted or attempted to assault either Lucas or Dailey, then the court should have given the instruction requested and refused. On the other hand, if there is no evidence in the record that either Lucas or Dailey were at any time in any danger from Stone, Prebble, Fronk, or either of them, and if there is no fact or circumstance from which it can be reasonably and fairly inferred that Lucas or Dailey were at any time in danger from Stone, Prebble or Fronk, and if there is no evidence tending to show that Stone, Prebble or Fronk, or either of them, were acting in concert or agreement with Sagaser, or aiding and abetting him in assaulting or attempting to assault either Lucas or Dailey, then it is equally plain that the instruction should have been refused. It is so elementary as not to need citation of authority that an instruction presenting an issue should not be given unless there is some evidence upon which to base it. I may say, however, at the outset that it is conceded in the opinion that neither Prebble, Fronk nor Stone made any attack upon Lucas or Dailey and so this feature need not be again alluded to. Addressing myself then to the only point in issue, I feel warranted in making the broad statement that there is not a single fact or circumstance in the record that either shows or tends to show that Stone, Prebble or Fronk, or either of them, were acting in concert with or aiding or abetting Sagaser in the assault he made or attempted to make upon either Lucas or Dailey. This being so, it is clear that the trial court properly refused to give the instruction requested. But, in order that there may not be any doubt as to the correctness of this statement, I have copied all of the evidence of Dailey and Lucas that has any reference to this question. I shall not allude to the evidence of any other

witness, because no other witness introduced made any statement that throws any light upon it except Stone, Prebble and Fronk, and each of them say that Lucas killed Sagaser without excuse or provocation, and that he had not assaulted or attempted to assault either of them. They were not called on to deny that they were acting in concert or agreement with Sagaser, or in any way aiding or abbetting him, because this was not made an issue in the case and no question suggesting this was asked either of them by counsel for Lucas, although each of them was cross-examined at great length and upon every possible feature of the case.

Lucas upon the point under consideration testified upon this direct examination as follows:

"Q. Now, Mr. Lucas, what happened when you reached the corner of Seventh and Pleasant?"

"A. Well. after we passed down by that church, just a little while before we got to the crossing, there was some men overtaken us, and asked us where we was going to stay all night at, and Dailey told them he was going to old man Curtis', where he has stayed some nights before, that he kept an all-night house, that he was going to stay there in order to get off on the early morning train to Cynthiana,. which he claimed left at five thirty in the morning; that he didn't intend to lay down, so he could leave the town about six o'clock, and Dailey fell back with these fellows and I walked on a little distance ahead, and just about the time we crossed that street, I looked back, and there was some gentleman walking on the right-hand side of Dailey, was in the act of hitting him on the head with something in his hand, and he struck this thing at him, striking him right here, and I remarked to the gentlemen, 'Oh, hell, boys, don't do that,' and immediately he run backward and at the same time he come near hitting me over the head with that; I run back and got my gun as quick as I could and commenced firing at him just immediately, and in running backward he struck at me the second time, and when I seen he was running I quit shooting. I walked over to Dailey and asked him what that fellow had hit him for, and Dailey said: 'Those fellows meant to rob us,' and Dailey had his gun in his hand and his handkerchief in his left hand wiping his nose. It was all bleeding. And he said, 'We'd better get away from here,' and we started and went away immediately."

"* * * * * * * * *"

"Q. How were those shots fired?"

"A. They was fired just about as fast as I could shoot them."

"Q. Have you any idea what time this killing occurred?"

"A. Yes, sir, it was not far from one o'clock in the night, I don't think."

"* * * * * * * *"

"Q. Did you tell four men that you didn't want a boarding house or a hotel, that you wanted to find a stable where you could lie down?"

"A. We didn't. They asked us where we were going, and Dailey told them we were going to Curtis', and some one of them, I don't know who, said, 'If you fellows have got any whisky, we can take you up here to a stable,' and Dailey said that he was going to Curtis', where he could take that early train."

"Q. Where was that conversation?"

"A. Right about the corner where the shooting took place."

"Q. Mr. Lucas, I will ask you if, at the corner where the shooting took place, Mr. Dailey asked four men to come have a drink with him, and you said to him, 'Don't give those sons of bitches any of our whisky?'"

"A. I didn't. Dailey didn't offer no whisky. All that was said, Dailey told them he had a quart of whisky, and they said we could go to that stable and stay there. He didn't say what stable."

"Q. He never asked them to have any whisky at all?"

"A. No, sir."

"Q. They did say, after they came up to you, that you could all go to the stable and stay all night?"

"A. 'Have you men got any whisky?' I think I remarked to Dailey to come on, and when I stopped and looked back, this man was a hitting Dailey."

"* * * * * * * *"

"Q. How far ahead of Dailey were you?"

"A. At the time that fellow hit him I suppose it was six or eight feet, something like that, ahead."

"Q. Further north on Pleasant street than was Dailey?"

"A. Yes, sir."

"Q. Have you any idea what it was that this man Sagaser was hitting Dailey with?"

"A. He was hitting him with some kind of an instrument that hung down. I could see it and heard it crack

when it hit Dailey's cheek, but what it was—I couldn't be able to say what it was."

"Q. After you said to Sagaser, 'Hell, boys, don't do that,' what then did Sagaser do?"

"A. He immediately made at me with a heavy blow, overhanded, as he struck—overhanded that way as he run back at me, and I run back, which was out of his way and got my gun and, therefore, immediately commenced shooting at him."

"Q. How did you say these shots were fired?"

"A. Just about as fast as I could shoot them."

"Q. Did you say anything at all to those four men until they overtook you there on the corner?"

"A. I did not."

"Q. Did not? Did Dailey?"

"A. No, sir."

On his cross-examination, he was asked and testified as follows:

"Q. What happened between Sagaser at that time, or the one man with Dailey?"

"A. What happened?"

"Q. Yes."

"A. Why, this here fellow hit Dailey in the face with something."

"Q. What did he hit him with?"

"A. I couldn't be able to say what he hit him with. With some kind of a stick he had in his hand, struck him right there with something. I says, 'Oh, hell, boys, don't do that.'"

"Q. Do you know what he hit him with?"

"A. No, sir."

"Q. Don't know now?"

"A. I do not."

"Q. Well, when he did that, what did he do?"

"A. I says, 'Oh, hell, boys, don't do that.'"

"Q. Then what happened?"

"A. Then he made directly at me with a blow, that way. I got my gun and immediately commenced firing at him, at the man."

"Q. Did he strike you?"

"A. No, sir, he didn't hit me."

"Q. How many times did he strike at you?"

"A. Twice."

"Q. How many times did he strike Dailey?"

"A. He struck Dailey once that I know of."

"Q. Where did he hit Dailey?"

"A. Right here."

"Q. What position was Sagaser in when you fired the first shot?"

"A. The man that was doing the striking at me?"

"Q. Yes."

"A. Sagaser was coming this way at me. I was running back and I got my gun and commenced shooting back, back that way."

"Q. Took your gun out of your pocket?"

"A. Yes, sir."

"Q. Which pocket did you take it out of?"

"A. Out of my right hippocket."

"Q. What position was he in when you fired the first shot?"

"He was facing me, as I thought. I held the gun just this way, shooting at the man."

"Q. As you thought?"

"A. Yes, sir."

"Q. Didn't you know?"

"A. I think he was."

"Q. What was he doing?"

"A. He was striking at me."

"Q. Where was he when you fired the first shot?"

"A. Yes, sir."

"Q. What did he do when you fired the third shot?"

"A. By the man being shot in the back—"

"Q. I'm not asking you that. What did you see?"

"A. Why, I couldn't say what I saw."

"Q. You don't know? Don't you know where he was?"

"A. Yes, sir."

"Q. Where?"

"A. Right in front of me."

"Q. How far?"

"A. He was, I expect, five or six feet."

Dailey, on his direct examination, testified as follows:

"Q. Now, tell all the conversation that took place there, and if anything occurred there, tell it all?"

"A. As we walked down the street there, these four men came up, and one gentleman walked up by the side of me, on the right side walking along the street, and I was talking, and we got down to the corner there by the church, there was something said about—he asked me where we was going to stay at that night, this fellow

that was walking by the side of me says, 'Where you going to stay at tonight?' And I said I thought I would go down to old man Curtis', that he kept open all night, that I wanted to get away on the early train back to Cynthiana, on that train that leaves at 5:35, due to leave here, I think it is or was at that time, it is due in Cynthiana at six o'clock, and he says to me, 'I have a friend down here at the livery stable where we can all go, if we go in and don't strike our matches.' I says, 'I don't care to go to no livery stable to stay all night.' At that, this fellow struck me with something, or the other, I don't know what it was. I didn't know what it was at the time, I don't know yet. He struck me with something. I kind of staggered back, that way, and Mr. Lucas turned around and says, 'Don't do anything like that, boys.' and this fellow started—Mr. Lucas had kind of turned to the right, not further than five or six steps, and this fellow started at him with his hands in this position as though he was going to strike him or something of the kind, and at that time the shooting was done. All these men left us right there, they was running towards this corner, run back around the corner, the way we come down, two of them run that way, and the other two around the other one, and we went down the street to the left by this church.''

''Q. How hard did he hit you with this instrument, whatever it was?''

''A. You say, how hard?''

''Q. Yes.''

''A. Well, he hit a pretty hard lick, enough to stagger me back off the sidewalk into the street, like.''

''Q. Had you said anything to provoke an assault on the part of that man?''

''A. No. sir, I didn't say anything at all except that I said that I didn't care to go to a stable to stay all night, in the first place, when he asked me where we was going to stay all night.''

''Q, Had any difficulty with these men?''

''A. No, sir, had not had any words with nobody.''

''Q. Did you have any difficulty or any words with any member of this party of four men?''

''A. No, sir.''

''Q. Had you done anything at all to cause this man to strike you with this instrument?''

''A. No, sir, I had not.''

"Q. What effect, if any, did this blow have upon your face?"

"A. Right there, struck me right there."

"Q. Say where?"

"A. On the side."

"Q. On the side of the nose?"

"A. Yes, sir."

"Q. On the cheek?"

"A. On the jaw, kind of blasted my jaw, right there, between the cheek-bone, right in there, where he struck me, on the right side."

"Q. Now, after the shooting occurred, what happened? I mean immediately, right there?"

"A. Well, immediately, right there, the men all disappeared, and Mr. Lucas walked to me and says, 'Are you hurt?' And I says, 'Well, I am hurt pretty bad' I was kind of stunned at the time. My nose was a bleeding a little, and he says, 'Well, you arn't hurt bad,' and I says, 'No, sir,' and he says, 'Let's go on down street,' and we walked on down street."

"Q. Say anything else?"

"A. He asked me what this man hit me for, and I said I didn't know unless they intended to try to knock me down and try to get what I had."

It will thus be seen that Lucas placed his entire defense and his right to shoot Sagaser upon the ground that Sagaser after attacking Dailey started towards him. There is no evidence in the record that Stone, Sagaser or Fronk ever saw Dailey with any money, or knew that he had any money, although he had about eight dollars, nor is there an intimation in the record that either of them, or any person in the presence of either of them ever made any suggestion to Dailey or Lucas about gambling. Prebble, a saloon-keeper, knew that Dailey had some money, because he saw him with it when he bought the whisky; but, no person pretends to say that Prebble ever mentioned gambling to either of them. Nor is there a particle of evidence or any circumstance from which it can be inferred that either of these parties made any effort to or had any intention of robbing Dailey. It is true that Lucas says in the testimony before quoted that after he had killed Sagaser, he asked Dailey "What that fellow had hit him for," and Dailey said, "Those fellows meant to rob us," and Dailey testifies that after the shooting Lucas asked him "What this man hit him for, and I said, I didn't know

unless they intended to try to knock me down and try
to get what I had." But this is the only mention, either
directly or indirectly, of robbery in the record, and this
matter was brought to the attention of Lucas after he
had killed Sagaser.

I may also mention that although the record shows
that Sagaser was a young man of bad character, or
rather that he was a quarrelsome and dangerous man, no
attack whatever was made upon the reputation of either
Prebble, Stone or Fronk; nor is there any evidence in
the record that either of them was of bad character.
It is true that these four men were together when they
met Lucas and Dailey, in front of the Methodist church
on one of the principal streets of the city, but the uncon-
tradicted evidence is that Prebble after closing his sa-
loon for the night, went out on the street and met Saga-
ser, and asked him to go home with him and stay all
night,. that Stone and Fronk were also on the street in
front of the saloon at a lunch wagon, where there were
several other persons, and Stone and Fronk walked
along with Prebble and Sagaser, and in this way all of
them happened to be together when they met Lucas and
Dailey. Now, unless the mere fact that these four men
—two of them going home and the other two walking
along with them—on a bright, moonlight September
night, is evidence that they were together for the pur-
pose of assaulting or attacking or trying to rob Lucas
or Dailey, there is no evidence whatever in the record
that they were together for either of these purposes.
They were out on the street as they had the right to be
and in the absence of some evidence to support it, and
there is none, it is not fair to say that they were together
for any evil purpose. That they were not aiding Saga-
ser or acting in concert with him when the shooting oc-
curred has already been shown. And yet, in the face
of this evidence, the court orders a reversal because the
trial judge did not submit to the jury an instruction
presenting an issue that was unsupported by any evi-
dence.

Lucas, an intelligent man of mature years, who was
not tried for several months after he had killed Sagaser
by shooting him in the back, placed his right to thus kill
Sagaser upon the sole ground that Sagaser was in the
act of assaulting him. And upon this issue, which was
the only one in the case, the jury was properly in-
structed.

In this connection it may also be said that Dailey and Lucas who had been making the rounds of the saloons were both under the influence of liquor—Lucas being very drunk. They were each armed with pistols, while neither Prebble, Fronk or Stone had any weapons. The evidence further shows that on the night of the killing, as well as on the next morning, Lucas said he was drunk and did not know that he had killed anybody, and three disinterested and reputable witnesses say that they saw and talked to Dailey on the next morning and did not notice any bruise on his face.

It, therefore, seems to me that the conclusion reached by the majority of the court in ordering a reversal of this case is a backward step in the administration of the criminal law. It lays down a rule, in conflict with the settled practice, that an instruction should be given only when authorized by the, evidence, and in effect directs trial judges to submit when requested instructions upon issues that are not in the record or based on any reasonable inference that can be drawn therefrom.

JUDGES SETTLE and LASSING concur in this dissent.