## Martin v. Commonwealth.

Dec. 12, 1944.

Clyde L. Miller and Edward L. Allen for appellant.

Eldon S. Dummitt, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

On May 23, 1942, appellant, then about 46 years of age, shot and killed Billie Martin, a second cousin, about 17 years of age. A true bill charged murder, and we gather from the transcript and appellant's brief there had been former trials resulting in hung juries. Appellant was finally tried in September, 1944, by a jury brought from a neighboring county, found guilty and sentenced for a term of eleven years in the penitentiary. While on motion for new trial eight or more grounds were laid in support, here appellant relies upon three grounds:

(1) The court erred in not giving the jury an instruction on involuntary manslaughter; (2) failed to give correct instruction on the law of self-defense; (3) in overruling motion for peremptory.

The homicide occurred late in the evening of the date stated, at a point called in the testimony "Y," which is formed by the junction of highway numbers 23 and two branches of No. 80. In this "Y" and not far from the junction is a restaurant, and still nearer to the junction a concrete island upon which is a small building and gasoline pumps. Appellant lived on highway No. 23, a short distance from the junction and nearly opposite the concrete island. Billie Martin lived about a half mile distant, up and back from highway 23. These points are prominent in the testimony. It is amply shown that some bad feeling existed between appellant and deceased.

On May 20th the boy was on the premises of appellant when some trouble arose, and as claimed by appellant the boy went to the highway and threw several rocks, some striking and injuring appellant. During the afternoon of the day of the homicide the boy had stopped on the highway near appellant's home, cursed him and said that if he ever caught appellant off his premises he "would fix him." Later in the afternoon, about dusk, Billie Martin and his half-sister (about 25 years of age) left their home and went to the home of a neighbor for the purpose of getting a dog, described as being half shepherd and half German police. In going they passed appellant's home; the sister says she saw appellant, but it does not appear that he saw the boy and his sister. The sister testified that when they returned from Laven's home they brought their dog, and some young puppies which the sister was carrying in a box. Her version

of the shooting was that when she and deceased got near the concrete island appellant was standing on his porch. As they moved on (not on highway 23 toward their home) appellant crossed the highway toward Moore's restaurant, and crossed the "gravel onto the Beaver road (Highway 80) and our dog started out and I said 'come here Hazel,' my brother stooped over to get her and he (appellant) turned around; drew his pistol and shot." The bullet struck the boy under his left collar bone; he grabbed his shoulder, walked to the restaurant and was taken to the hospital where he died two days later. On cross-examination the sister said that she was watching the dog "to see that she didn't bother any one," and when she spoke the dog turned and trotted behind her and Billie. Witness admitted that she and appellant had not been on speaking terms for quite a while.

Moore, the restaurant proprietor, testified that he was in the front part of his restaurant; looked through the window and saw appellant coming out of his home. About the same time he saw deceased and his sister coming up the road. The sister was carrying a box, and she and her brother were "almost side by side, and the dog along side them" He said the dog had "stepped out a little bit, and the boy started to stoop and raised back and was in a little stooped position" when the shot was fired.

On cross-examination it developed that this witness had seen the parties first from the front window of his restaurant and concluded that something was going to happen; he went back to a kitchen window and saw what is related above and below. Counsel contends that it was practically impossible for witness to see the parties from that window because of the physical situation, and from the plat on file it would appear that he would have difficulty in seeing all the parties. However, witness said that he could and did see appellant walking fast. Asked if he turned around, he answered, "He just threw his gun back like that." In explaining this he said he "wheeled and shot." This witness and appellant were not on friendly terms.

The foregoing constituted substantially the Commonwealth's testimony, and at this point, on motion of counsel for defendant, the court sent the jury to the scene with instructions to view the premises, and the

inside of the restaurant and windows. Thus the jury were in position to measure the testimony of the restaurant proprietor better than we can from the evidence and exhibit.

Appellant first testified in detail as to the difficulty a few days previous to the day of the homicide, saying that the boy was in the barn answering a call of nature in presence of his little girl. He said he picked her up and started to the house with her and later the deceased went to the road and threw four or five rocks, several of which struck him, one injuring his hand. He said that he had spoken no word to the boy; that he was afraid of him (it appears the boy was large for his age, strong and athletic). He also tells of a threat that if he "ever caught me out of my yard he would kill me." Appellant said that on the afternoon of the homicide he had started to the home of a neighbor to call a doctor for a sick child. After he had crossed highway 23, and partly across the gravel plot in front of the restaurant, he saw deceased, the sister and the dog, at a point between the stop sign and the restaurant building. He said the boy began to pick up rocks, and he heard the sister say, "Stop, brother, stop," and he started to run, because "I was afraid for my life;" that "the boy, his sister and the police dog were running as fast as they could go straight behind me, and Billie threw a stone and hit me in the back of the head. I reached into my coat pocket and got my gun and threw it back over my shoulder, and fired in that direction, in about that shape and position, and behind me was Billie, his sister and the police dog, all three running fast." He fixes himself at a point "about opposite the middle window of Ed Moore's beer joint; I was on the side of highway 80 next to the building." He said that as soon as the shot was fired Billie and the sister went to the Moore beer joint, and he went on to Rice's and had some one to call the doctor for his child. He did not know his shot had taken effect. At another point he said that the sister had a black-jack strapped to her wrist, and he thought he was in deadly peril at the hands of the boy and sister, aided by the dog.

On cross-examination he said that he and deceased had not spoken to each other for about four years, and that he had on the day of the first alleged assault gotten a peace warrant for Billie, but had never had it served.

He denied the threatening language, attributed to him by witness Hall, that is, "I'll make him remember this."

Another eye witness to a part of the occurrence was a niece of appellant who was at home on highway 80 near the restaurant. She saw her uncle cross the "Y" near the junction. She saw deceased pick up a rock and start running after appellant, toward Allen, throwing a rock in appellant's direction. She thought there would be a fight and turned away and saw nothing more till some time after the shot was fired.

This is the substance of the evidence not given so much in detail, since such recital is not necessary for the purpose of reaching the legal questions. Following its introduction, the court gave the usual wilful murder and voluntary manslaughter instructions with definitions of technical words used. The self-defense instruction was in the usual form, but limited the jury to consideration of the right of defendant to shoot and kill, in the event he believed and had reasonable grounds to believe that he was in danger of death or great bodily harm at the hands of Billie Martin, Jr. It is contended that under appellant's theory of the case, and his proof, the court should have embodied in the instruction his right to defend himself from all who were endeavoring to assault him.

Little need be said of either points, (1) or (3.) The court should not have, under the proof, given an instruction on involuntary manslaughter. The proof of appellant did not tend to show that he was recklessly or carelessly handling a firearm or shooting at random on a public highway, and in either manner fired the fatal shot. Such an instruction would have been inconsistent with his plea of shooting in self-defense upon which appellant forcefully relies. The facts here are far from such as were shown in Smiley v. Com., 235 Ky. 735, 32 S. W. 2d 51, upon which we predicated the right to involuntary manslaughter instruction. As to point (3), a reference to the evidence as we have briefly recited it will demonstrate that the court correctly overruled motion for a peremptory instruction.

Contention (2) presents a more serious question. The Commonwealth insists the proof showed that when the shot was fired appellant could not have apprehended any danger either from the sister or the police dog; that

6

the inclusion of the latter in the alleged existing apparrent dangerous situation was an afterthought and pure fabrication. Further that because of the numerous contradictions by appellant and his reluctance to testify fairly on some points his story is so incredible as to authorize the court to confine his right of defense to the danger to him at the hands of deceased. We agree that we are not impressed with some of the statements made by appellant but our discounting does not warrant us in ruling out completely appellant's testimony of his theory of the case. It is not to be overlooked that the sister, the chief prosecuting witness, testified that after appellant "hit the hard road (No. 80) the dog started out." She called her back, and as the brother stooped over to get her shot was fired. Appellant also said more than once that the sister had a blackjack strapped to her arm. She was not recalled to make denial of this charge. At another point she said she was watching the dog to see that "she did not bother any one."

In view of this state of the evidence, and the unequivocal statement of appellant that deceased and his sister and the police dog "were running as fast as they could right behind me, all moving fast," and again: "I was in peril of losing my life at the hands of Billie, his sister and the dog; I knew if all three attacked me it would be my end," it appears to us that the court should have so drawn the instruction as to include the danger, real or apparent, as it appeared to appellant, from deceased or those acting in concert with him.

While most of our cases, including those cited by appellee, hold that under the evidence as adduced in the various cases, the extended instruction was not authorized, as for example, Griffin v. Com, 204 Ky. 783, 265 S. W. 327, we have not infrequently held that an instruction on self-defense is erroneous if it does not include the right of the defendant to protect himself from the deceased and others, acting in concert, where the proof tended to show that the assault was a concerted action. Watkins v. Com., 123 Ky. 817, 97 S. W. 740, 29 Ky. Law Rep. 1273; Bowling v. Com., 126 S. W. 360; Buttery v. Com., 211 Ky. 23, 276 S. W. 969; Lucas v. Com., 141 Ky. 281, 132 S. W. 416. Likewise when a defendant testifies in his own behalf, admitting that he committed the deed charged, and attempts to justify or excuse the act, he has a theory of the case to be pre-

sented to the jury in appropriate instructions, provided there be evidence to support his theory. Johnson v. Com., 268 Ky. 555, 105 S. W. 2d 641, and cases cited.

We have noted the instruction prepared by the writer of the opinion in the Watkins' case, supra, and directed to be given on new trial, and it seems to fit the case here, omitting necessarily so much thereof as relates to the defense of those who were companions of Watkins. It is further suggested that the instruction laid down in sec 900, p. 1204, Stanley's Instructions to Juries, will afford a workable pattern. Being of the opinion that the self-defense instruction did not correctly present the law of the case under the facts, we are compelled to reverse with directions to grant appellant a new trial.

Judgment reversed.

The whole court sitting.