## Gross v. Commonwealth.

March 6, 1945

Marion Rider for appellant.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

On the night of October 30, 1943 (Hallowe'en night), appellant shot and killed Paul Hellard. The homicide occurred on the south side of Broadway in Frankfort. Upon an indictment charging murder he was tried in January, 1944, the jury being unable to reach a verdict. On a second trial the jury found him guilty of voluntary manslaughter, fixing his punishment at confinement for a period of ten years. On appeal from a judgment in conformity with the verdict, it is contended that the trial court erred to the prejudice of appellant (1) in admitting incompetent and prejudicial evidence; (2) in overruling motion for a continuance, and (3) in giving an instruction on self-defense which was erroneous and prejudicial to the substantial rights of appellant.

There is no disagreement as to the following facts: Gross and his sixteen year old son lived on Broadway not far from the point where the homicide occurred. Gross had lived in Frankfort about four months. He was formerly a native of Morgan County, where some years ago he had been convicted of a felony; he was paroled, and fearing to return to his home county he went to Owen County where he worked for about a year; he then came to Frankfort where he obtained employment. He admitted that he had carried the gun intermittently because he had been threatened by certain persons in Morgan County, whom he had seen while in prison, and after he came to Frankfort. He admitted that he kept it loaded and had reserve ammunition, and was apparently willing to put the gun to use if the occasion arose.

On the day of the homicide Gross worked until noon; ate his noon meal and went up into town, where he bought some clothing. He returned home about 9 p. m., and not finding his son started out to locate him. He walked west on Broadway to St. Clair where he was told that the son had gone to a show. He turned back on Broadway on the south side toward home. Between St. Clair and Lewis Streets he overtook Paul Hellard, Louise Hayes, John Doss and Jane Carrier, walking two abreast, Hellard and his girl in front. He did not know any of the four and none of them knew him. Appellant walked behind the party until they had crossed Lewis Street, going eastwardly. From this point on, and as to just what occurred, there is considerable conflict. We shall give appellant's version first.

Appellant said that after stepping on the curb at the corner of Lewis Street the Carrier girl said "they are soaping the windows." Appellant said, "Yes, it looks like they are;" nothing further was said until a few steps had been taken, when the girl said, "Give me some soap", and he replied, "Girl I ain't got any soap. There ain't no place to buy soap at this time of night." The girl then said: "Looks like you need a cake to wash your face with." Still walking, John Doss said to Gross, "Are you trying to make something out of it?" and Gross said, "I ain't trying to make something out of it. One word brought on another. I didn't want any trouble; I stepped behind them; looked like they was going into the street, and they were going to drag me back out in the street, and I stepped two steps back up

to the wall, and he (Doss) said 'you are trying to make something out of this', and I said 'I don't know none of you people; I don't want no trouble.'" It was at this point he said that Paul Hellard hit him behind the left ear and knocked him back against the wall to his knees, and when he got up he pulled his pistol from his belt and shot him, as Hellard started toward him again. At that time Doss was standing right in front of him and Gross was about two feet from the wall of the building. He said that one of the girls, standing between him and Doss, said: "Go on John and let him alone, he aint done nothing." After he fired the shot he stood there for a few seconds, turned and walked back to Lewis Street, then to a point nearly in front of the police station, and officers came across the street and arrested him, as he says without any resistance on his part. Gross said that he fired the shot because "I was expecting them to rob me after they hit me and knocked me down; he knocked me down and was stepping in toward me, when I started up and shot him to protect myself."

Appellant was fully corroborated by witness Woodring, who was present, and apparently knew all the parties, except Gross. He was partially corroborated by an affidavit of an absent witness who was present at the scene. Mrs. Howser, the county jailer, testified that after Gross was brought to jail he complained of pain about his head. She examined his head, and said he had a knot, a bruised place on his head behind his ear.

Edward Dean for the Commonwealth testified that he was near the scene at the time of the shooting. He was in a truck, and as he turned in Broadway he saw a couple of men standing near the corner facing each other. One man backed up two or three steps, "walked backwards, and pulled a pistol and shot." He learned later the man who had shot was Gross; he did not know any of the other people.

Mrs. Oma Stiles lived over a garage on the north side of Broadway, almost opposite Sawyer's restaurant near which the difficulty occurred. She was in a front room looking across the street. She saw the man who had the pistol standing right in front of the man who fell on the sidewalk. She said that immediately before the shooting neither advanced toward the other. The man who fell was standing with his hands in his pockets.

She identified Gross as the man who fired the shot. On cross-examination she said her attention was not particularly attracted until "they ganged up there." Asked to explain what she meant by "ganged up", she said, "Well, they was the two men, Hellard and this man was standing in front of him." She said there were three men, Hellard, Gross and some other fellow. She was positive that Gross was not on the sidewalk next to the wall, but was on the edge of the curb, and places Hellard at the same point. She did not see Hellard strike Gross.

Jane Carrier describes how the four proceeded east on Broadway. They were talking about the windows being soaped, and she first saw Gross near Sawyer's restaurant. "Gross got to talking and said to me, You need some one to wash your face." Johnny (Doss) said, "Her face is not dirty." Gross had started to turn "in there" (Sawyer's), but turned around and came back and said to Doss, "Do you want to do something about it?" Witness got Doss by the arm and took him up the street, but he came back. "We was all standing there; I stepped in between him and Johnny. Paul pushed him on the shoulder, and he just stepped back; pulled his pistol from his belt and shot Paul; he was standing still, and had his hands at the side."

John Doss leads himself and his companions to the point on Broadway near Sawyer's restaurant. He had never seen Gross before. They were talking about the soap on the windows. Gross told Jane she ought to take some soap and wash her dirty face. Doss said he didn't think she needed to wash her face. "I didn't say anything. Paul walked up and pushed him on the shoulder; told him he was a liar; told me to come on, and that's when the shooting took place. All I seen he just stepped back and raised his hand and the gun went off." He thought Gross stepped back 8 or 10 feet.

On cross-examination Doss admitted that he was drunk; he did not remember what he said to Gross after he made the remark to his girl friend, except "there wasn't no cussing." He denied that she took him by the arm and led him away. It was proven that Hellard's reputation for peace and good demeanor was bad.

Thus far we have a case where the evidence is conflicting; not on the question as to who fired the fatal shot, but as to whether or not under the proof and sur-

rounding circumstances Gross fired the shot in his right of self-defense. If he is to be believed, backed up by his witness Woodring, and the affidavit of the absent witness, it is a self-defense case. If the several witnesses for the Commonwealth are to be believed, Gross shot, not in self-defense but in sudden passion. This presented a question for the jury, and appellant finds himself in the same position as numerous others in similar cases, wherein we held that if self-defense is the excuse, it is incumbent on the defendant to present such proof as will satisfy the jury that his defense is sound.

The proof, which appellant complains was incompetent, was as follows: Gross had testified that after the shooting he went up Lewis Street toward police headquarters, though he did not say he intended to surrender. He said as he got in front of headquarters the police ran across the street and arrested him. He illustrates how he had his hands, but his illustration serves us no purpose, since the panorama is not described in transcript.

Officer Wainscott had been notified of the shooting. He did not know Gross; Dean pointed him out, and he and two other officers went across the street and made the arrest. The officer said: "Mr. Ellis and myself grabbed him and took his pistol off him. I told him who we were and he put his hand right in front where his pistol was. Mr. Gritton took hold of his arm and took his pistol out from under his belt." There was no objection to this testimony. The claimed objectionable testimony came from Officer Ellis, who was asked: "Tell what you did when you placed him under arrest: Ans. He acted like he wanted to get his gun; tried to get his hand down; two of them got him by the arm and took his gun out of his belt."

Counsel argues that since it was shown that Gross was not fleeing, this question was asked not for the purpose of throwing light on the only issue, but to prejudice the minds of the jury. Counsel relies on our opinion in Barker v. Commonwealth, 209 Ky. 817, 273 S. W. 503, but in that case the actions and statements were not made in the presence of officers who were making an arrest. Here the statements of the officers indicated that Gross was attempting to draw his pistol, thereby showing not only an effort to evade arrest, but as it appeared to them to get his pistol and to do them some injury.

The testimony was not prejudicial under all the facts and circumstances.

It is complained that the instruction on self-defense was erroneous and prejudicial. The instruction reads: "If the jury believe from the evidence that at the time defendant shot and killed Paul Hellard, if he did so, he, the defendant, believed and had reasonable grounds to believe that the said Hellard was about to kill him, or inflict great bodily harm on him, then the defendant was justified in using any means at hand to protect himself, his body and life against harm, or the apparent harm the defendant believed in a reasonable judgment the said Hellard was about to inflict on him, and if the jury so believe the jury should find the defendant not guilty on the grounds of self-defense."

Counsel has a double complaint of this instruction. One is the failure of the court to incorporate words which would express the right of Gross to shoot to protect himself against the danger, real or apparent, to him, not as the situation appeared to the jury. We do not see that the instruction is subject to this criticism. It is more favorable to appellant, since it gave Gross the right "to use any means at hand" to protect himself against harm or the apparent harm which he believed in a reasonable judgment was about to be inflicted upon him. The instruction did not follow the form which has been approved so frequently as to be a stereotyped form. It omitted entirely the words, "and that it was necessary or was believed by the defendant to be necessary in the exercise of * * * to use any means at hand", in order to avert the danger, real or to the defendant apparent. Courts should have no difficulty in following instructions which we have approved time and time again, particularly where there is to be given the simple defense instruction. We have approved such so consistently that it would seem difficult to improve them.

Lastly counsel insists that the court should have included in the instruction the right of Gross to protect himself from danger as it appeared to him at the hands of Hellard or Doss. In the case of Martin v. Commonwealth, 299 Ky. 1, 184 S. W. 2d 234, we reversed because of the failure of the court to extend appellant's right to defend himself from danger at the hands of those acting in concert with deceased. We reviewed several cases which are cited. In that case the evidence was perhaps

stronger than here presented. Nevertheless, when we take appellee's version of the affair, it would appear that Doss was the man who started the difficulty. According to Doss, he was ready for trouble, and would not allow himself to be led away. Taking some excerpts from the Commonwealth's witness, it would appear that there was a "ganging up" on Gross, and both Doss and Hellard were active. We conclude that the instruction was prejudicial. It is suggested that Form No. 900, Stanley's Instructions, will provide a pattern. Our conclusion obviates the necessity of discussing the alleged error in failing to grant continuance.

Judgment reversed with directions to grant appellant a new trial.

The whole court sitting except Judge Thomas.